UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ANTHONY CURIALE,                )
                                )
      Plaintiff,                )
                                )
      v.                        )     Case No. 2:21-cv-54
                                )
HARTFORD LIFE AND ACCIDENT      )
INSURANCE CO.,                  )
                                )
      Defendant.                )

## OPINION AND ORDER

Plaintiff Anthony Curiale brings this case pursuant to the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. § 1001 *et seq.*, appealing the termination of his long-
term disability ("LTD") benefits by Defendant Hartford Life and
Accident Insurance Company ("Hartford").  The parties have both
moved for judgment on the administrative record.  For the
reasons set forth below, Plaintiff's motion for judgment (ECF
No. 19) is granted, and Defendant's motion for judgment (ECF No.
22) is denied.

## Factual Background

### I.  Coverage History

Plaintiff was a Vice President at Bear Stearns when, in
December 1999, he was injured in a motor vehicle accident.  At
the time of the accident, his employer's benefits plan included
a primary group disability policy and a supplemental group

disability policy underwritten by Continental Casualty Company
and administered by CNA Group Life Assurance Company ("CNA").
The primary group policy is at issue here.  Plaintiff is
currently receiving benefits under the supplemental group
policy.

The primary and supplemental policies differ in several
respects.  The primary policy provides coverage for the first 60
months for an employee who is unable to perform his or her own
occupation because of injury or sickness.  After the first 60
months, the employee is considered disabled if he or she is
unable to engage in *any* occupation for which he or she is or
becomes qualified by education, training, or experience.  The
supplemental policy retains the own occupation definition of
disability throughout the coverage period.  The primary policy
pays the employee 66 and two-thirds percent of monthly earnings
with a maximum benefit of $3,500 per month.  The benefit is
reduced by certain other benefits, including Social Security
Disability Insurance benefits ("SSDI").

On January 29, 2001, Plaintiff applied for LTD benefits
based on injuries related to the 1999 car accident.  CNA
approved the claim and began paying benefits as of July 18,
2001.  In or around 2003, Hartford assumed CNA's rights and
responsibilities to administer and pay benefits.  Plaintiff was

awarded SSDI benefits on February 1, 2003.  Under the
supplemental policy, he is receiving payments of $809 per month.

On July 17, 2019, Hartford notified Plaintiff that he no
longer qualified as disabled under the primary policy, and that
it was discontinuing those LTD benefits.  AR 1004-09.  The
denial was based in part upon a statement by Plaintiff's
treating physician that Plaintiff could perform sedentary work
on a full-time basis.  The physician has since revoked that
opinion.

Plaintiff requested an administrative appeal on January 2,
2020.  Hartford issued its decision upholding the denial of
benefits on March 26, 2020.  AR 1052-57.  This civil action
followed.

## II.  Medical History

Plaintiff suffered head, shoulder, and back injuries in the
December 1999 motor vehicle accident.  In January 2001, after
undergoing left rotator cuff repair surgery, he stopped working.
Plaintiff submitted his disability benefits claim to CNA on
January 29, 2001.  On March 26, 2001, Dr. Alan DeRovira
completed a Physician's Statement indicating that Plaintiff had
radiculopathy and a rotator cuff tear, had undergone rotator
cuff repair, and was taking Percocet for pain.  Dr. DeRovira
opined that Plaintiff was not capable of working, and
specifically could not stand or lift.

On June 15, 2001, Dr. William Main concluded that Plaintiff required back surgery.  After an initial fusion surgery failed to relieve Plaintiff's back pain, Dr. Main recommended an additional fusion.  The second fusion was delayed until 2006, in part because of Plaintiff's cardiac condition.

On several occasions in 2001 and through September 2002, Dr. DeRovira reiterated his conclusion that Plaintiff was totally disabled as a result of injuries and surgeries related to the 1999 automobile accident.  On October 15, 2002, Dr. DeRovira completed a Medical Source Statement concluding that Plaintiff's maximum capacity for sitting continuously was less than one hour; that he would need to alternate postures by walking; that he could stand or walk for 15 minutes at a time; and that he would have to lie down or recline for more than three hours before returning to other continuous activities.

On October 17, 2002, Dr. Main completed a Medical Source Statement and reached similar conclusions.  Specifically, Dr. Main found that Plaintiff's maximum capacity for sitting continuously was one hour; that he could stand or walk for 15 minutes at a time; and that he would have to lie down or recline for more than three hours before returning to other continuous activities.  Both Dr. DeRovira and Dr. Main found that Plaintiff could lift more than five pounds rarely, and could rarely move his neck.  On December 2, 2002, Plaintiff was evaluated by

4

orthopedic surgeon Dr. Donald Goldman, who recommended that Plaintiff receive LTD benefits as result of his multiple injuries.

Nearly every year between 2002 and 2011, Dr. Main issued a statement reiterating that Plaintiff had significant physical limitations.  A 2009 statement concluded that Plaintiff could only sit, stand, and walk for one hour in an eight-hour workday. Dr. Main repeated that finding in 2011.  In May 2013, Dr. Gregg Myer echoed that same conclusion.  Both Dr. Main and Dr. Myer concluded that Plaintiff's limitations were permanent.

In 2014, treating physician Dr. Patrick Francis reached essentially the same conclusions as those of Dr. Main and Dr. Myer, including that the limitations were permanent.  Dr. Francis repeated those findings twice in 2015, and again in 2017.  His 2015 form made clear that Plaintiff could sit, stand, or walk for not more than one hour each in a work environment. AR 433.

On March 17, 2017, Plaintiff was evaluated by orthopedic surgeon Dr. Judd Smith related to lower back pain.  Dr. Smith found radiological evidence of pseudo-arthritis and determined that a further workup was required to determine whether the condition was due to an infection.  A July 12, 2017 CT scan showed evidence of loosening or infection of hardware, including a pedicle screw.  That same day, Plaintiff underwent surgery to

5

explore the fusion in the lumbar spine, remove hardware, excise and debride skin to bone, and culture deep tissue.  A second procedure was performed on July 13, 2017 to remove hardware, reinstall instrumentation, and apply bone protein.

On September 1, 2017, Plaintiff was evaluated for physical therapy.  On October 31, 2017, he reported that his home physical therapy program was nearly impossible.  Plaintiff's symptoms included back pain between five and eight on a ten-point scale, poor sleep due to pain, and discomfort while seated.  Plaintiff was able to sit for 30 minutes, stand for five minutes, and walk at a slow pace for 25 minutes.

On March 27, 2018, Dr. Jeremy Collins at Dartmouth Hitchcock Medical Center ("DHMC") Pain Management Center offered a treatment plan that would slowly reduce Plaintiff's use of opioids.  The new plan was in response to developments in the medical literature, which no longer supported the use of narcotic medications for chronic pain.  AR 304.  Dr. Collins also recommended lifestyle changes.

On May 10, 2018, Plaintiff told Dr. Francis that he had been transitioning to fewer narcotics, and that the transition had been difficult.  A mental health questionnaire indicated mild depression.  Dr. Francis noted that Plaintiff's pain intensity was similar to when he was on the highest dose of opioids.  Dr. Francis also observed that Plaintiff had

neurological deficits and subjective pain while walking,

bending, squatting, and during prolonged sitting.  Dr. Francis

stated in his notes:

> [Plaintiff] is still likely permanently disabled from
> jobs requiring any extensive sitting or standing
> (without interruption), heavy or frequent lifting, or
> bending at the waist.  However, I think it would be
> good to check in with him in 6 months to reassess
> this.

AR 382.  Dr. Francis also completed an Attending Physician's

Statement ("APS") in which he indicated herniated discs at L4-5

and L5-S1 and spondylolisthesis at L4-5.  X-rays showed a fusion

from L3 to L5 with instability.  Dr. Francis noted a series of

limitations, including Plaintiff's inability to bend at the

waist, kneel, crouch, or reach above his shoulders.  While Dr.

Francis opined that the limitations were expected to last for

twelve months, he indicated on the form that Plaintiff had an

expected return to work date of six months.  AR 308.

In June 2018, Plaintiff suffered a stroke.  On September 7,

2018, Dr. Francis evaluated him for several issues, including

the stroke, cardiac issues, depression, and a possible hernia.

Regarding Plaintiff's disability, Dr. Francis wrote:

> [P]laintiff] brought paperwork from his insurance
> company that I had filled out in May regarding his
> eligibility to return to work.  I had placed the
> interval of 6 months to reevaluate his condition for
> possible return to work based on the fact that he was
> tapering off his opioids and I wanted to see if his
> level of pain improved after they were discontinued
> (i.e., did he have opioid-induced hyperalgesia).  He

7

> has been opioid-free for [approximately] 3 months, and
> though pain hasn't worsened considerably, it also
> hasn't improved much, so his level of disability
> remains the same as it has for several years,
> unfortunately, and it does appear that his condition
> is indeed permanent.

AR 2332.

On October 12, 2018, Hartford wrote to Dr. Francis and inquired about the note from May 2018.  The letter offered definitions for various levels of work, defining sedentary work as that which "involved sitting most of the time, but may involve walking or standing for brief periods."  AR 284.  The letter asked Dr. Francis whether he agreed that Plaintiff could perform such work on a full-time basis.  Dr. Francis placed an "x" on the line indicating that he did agree.  Dr. Francis also indicated that Plaintiff would be unable to meet the definitions for light or medium work.  AR 284-85.  He addressed Plaintiff's limitations more specifically as follows:

> In an 8-hour workday [Plaintiff] can sit for no longer
> than one hour at a time for no longer than 4 hours
> total; stand for one hour at a time for no more than 4
> hours total; or walk for one hour at a time for no
> more than 4 hours total.  He cannot lift more than 11
> pounds ever, and can only occasionally [lift 0-10
> pounds].  He cannot kneel[,] bend at the waist, crouch
> or reach above the shoulder but can occasionally reach
> below or at the waist.

AR 286.

On November 2, 2018, Plaintiff followed up at DHMC related to his stroke.  He reported that his language was slower than

8

prior to the stroke, that he paused while choosing words, and that he talked around missed words.  He also noted a shorter attention span while reading.

On January 14, 2019, Plaintiff presented with a bulge in his right groin and wanted to discuss hernia repair.  On January 24, 2019, he reported to the emergency room at DHMC with confusion and memory difficulties.  The following day, a neurologist examined Plaintiff and concluded that a stroke or seizures were possible, and that alcohol or (medicinal) THC use may have been contributing factors.  Plaintiff was also noted to have "normal bulk and tone."  AR 1673.  Plaintiff had surgery for his hernia on February 8, 2019.

On June 18, 2019, Dr. Francis completed an APS confirming Plaintiff's herniated discs at L4-5 and L5-S1, and spondylolisthesis at L4-5.  Dr. Francis opined that Plaintiff could sit, stand, or walk for one hour at a time and for four hours out of an eight-hour workday.  Plaintiff could lift zero to ten pounds occasionally, and could not reach above his shoulders.  He could not bend, kneel, or climb, but could do fine or gross manipulation frequently.  He could also reach below his shoulders.  These limitations were expected to last for 12 months.  AR 267.

On July 17, 2019, Hartford notified Plaintiff that it was discontinuing LTD benefits because it did not believe he was

unable to perform any occupation as defined by primary group policy.  Hartford reached this conclusion based in part upon Dr. Francis's June 18, 2019 APS.  AR 1005-07.

On January 21, 2020, Plaintiff underwent a functional capacity evaluation ("FCE") with Mark Coleman, OTR/L.  Mr. Coleman found that Plaintiff was capable of sitting for approximately one hour at a time, and for a total of three to four hours in an eight-hour workday.  Plaintiff could stand or walk for 10 minutes at a time for a total of one hour during an eight-hour workday.  Plaintiff could occasionally bend or stoop, could rarely kneel or crouch, could rarely climb stairs, and could rarely reach greater than 15 inches over his head.  He had stamina for two to three hours per day, and his pain levels were between five and seven during the examination.  AR 1111-19.

Plaintiff's counsel reportedly sent Mr. Coleman's FCE report to Hartford.  On February 26, 2020, Hartford wrote to Dr. Francis and asked him: "Does [Plaintiff's] functionality as you present on the 6/18/2019 APS remain valid and accurate for [July 16, 2019 to the present]."  Dr. Frances responded "no."  He added the following written notation: "I defer to the expertise of the clinician who conducted the FCE and will concur with their more restrictive recommendations to ensure the safety of this patient."  AR 1091-93.

On March 20, 2020, Hartford retained Dr. A. Alen Nourian, M.D., an orthopedic surgeon, to review Plaintiff's treatment records dating back to 2000.  Plaintiff notes that Dr. Nourian's report does not specifically mention several of the physician statements on record, including Dr. Francis's March 9, 2020 concurrence with Mr. Coleman's FCE.  Based upon his records review, Dr. Nourian concluded that Plaintiff could stand for up to 20 minutes at a time for two hours per day, walk for intervals of up to 15 minutes at a time for a total of two hours per day, and sit for up to 30 minutes at a time for a total of six hours per day.  He found that Plaintiff could occasionally climb stairs, stop, kneel, crouch, and could occasionally reach both overhead and below the waist.  He concluded that Plaintiff could sustain these activities for a 40-hour work week.  AR 1071-75.  With respect to Mr. Coleman's FCE findings, Dr. Nourian stated: "I respectfully disagree with the FCE study regarding recommendation of 2-3 hour workday only, as most of the study is based on self-reports, and there is no indication to alter work hours."  AR 1074-75.

On March 26, 2020, Hartford affirmed the denial of LTD benefits.  The decision relied in part upon Dr. Nourian's conclusions with respect to Plaintiff's work capacity.  The decision also cited a vocational expert who concluded that,

accepting Dr. Nourian's conclusions, Plaintiff could work as an assignment clerk or jacket preparer.  AR 1052-57.

On October 19, 2020, Dr. Erwin Lange completed an APS.  Dr. Lange confirmed Plaintiff's disc disease, and certain limitations including the inability to kneel, crouch, climb, or balance.  Dr. Lange also found that Plaintiff could do fine manipulation and reach above the shoulder occasionally, but could not do gross manipulations or reach below the shoulders or at a workstation.  Dr. Lange classified Plaintiff as permanently disabled.  AR 102-03.

### Standard of Review

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); *see also* 29 U.S.C. § 1132(a)(1)(B).  The plaintiff "has the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan."  *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (internal quotation marks omitted).  The "question of whether or not a claimant is disabled must be judged according to the terms of the [p]olicy."  *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010).

In reviewing a denial of benefits challenged under ERISA, a court must apply a *de novo* standard unless, as in this case,

"the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or

to construe the terms of the plan," in which case the court

applies an abuse of discretion standard.  *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *accord Hobson v.*

*Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).

Applying the abuse of discretion standard, a court will not

disturb an administrator's decision unless that decision is

arbitrary and capricious.  *McCauley v. First Unum Life Ins. Co.*,

551 F.3d 126, 130 (2d Cir. 2008).  A decision is arbitrary and

capricious if it is "without reason, unsupported by substantial

evidence or erroneous as a matter of law."  *Pagan v. NYNEX*

*Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (citation

omitted).  Substantial evidence is "such evidence that a

reasonable mind might accept as adequate to support the

conclusion reached by the administrator and requires more than a

scintilla but less than a preponderance."  *Durakovic v. Bldg.*

*Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010)

(internal quotation marks omitted).  "[I]n cases where the

evidence conflicts, an administrator's conclusion drawn from

that evidence that a claim should be denied will be upheld

unless the evidence points so decidedly in the claimant's favor

that it would be unreasonable to deny the claim on the basis of

the evidence cited by the administrator."  *Roganti v. Metro.*

13

*Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015).  A court is

"not free to substitute [its] own judgment for that of [the

insurer] as if [it] were considering the issue of eligibility

anew."  *Hobson*, 574 F.3d at 83–84 (internal quotation marks

omitted).

In this case, the Court must also take into account the

conflict of interest that arises from Hartford's dual role as

administrator and payor under the primary policy.  *See McCauley*,

551 F.3d at 133.  Such a conflict does not change the standard

of review to *de novo*, but a court must nonetheless weigh the

conflict as "a factor in determining whether there is an abuse

of discretion."  *Pagan*, 52 F.3d at 442 (quoting *Firestone Tire*,

489 U.S. at 115 (internal alterations omitted); *see also*

*McCauley*, 551 F.3d at 133.

## Discussion

Plaintiff submits that during his entire medical history

since the car accident, his treating physicians have

consistently concluded that (1) he is unable to perform full-

time work and (2) his condition is permanent.  The notable

exceptions to that consensus were Dr. Francis's notes in 2018

and 2019.  In the first such note, written May 10, 2018, Dr.

Francis stated that although Plaintiff was "still likely

permanently disabled," he intended to reassess Plaintiff's

disability in six months.  AR 382.  While he indicated that

14

Plaintiff's limitations were expected to last for 12 months, he also wrote that Plaintiff could be expected to return to work in six months.  AR 308.

In September 2018, Dr. Francis clarified the purpose of the six-month reevaluation.  As discussed above, Dr. Francis explained that he "placed the interval of 6 months to re-evaluate [Plaintiff's] condition for possible return to work based on the fact that he was tapering off his opioids and I wanted to see if his pain improved after they were discontinued (i.e., did he have opioid induced hyperalgesia)."  AR 2332.  Dr. Francis then reported that, in fact, Plaintiff's condition had not improved: "though pain hasn't worsened considerably, it also hasn't improved much, so his level of disability remains the same as it has for several years, unfortunately, and it does appear that his condition is indeed permanent."  *Id.*  In other words, despite a recent surgery and a change in approach with respect to pain management, Plaintiff's condition was unchanged from prior years.

Hartford wrote to Dr. Francis in October 2018 and inquired about the May 10, 2018 note indicating an expected return-to-work date in six months.  The letter offered Dr. Francis the opportunity to check a line if he agreed that Plaintiff "is currently able to perform Sedentary Work on a full-time basis."  AR 284.  Dr. Francis checked that line.

Hartford wrote to Dr. Francis again on February 26, 2020, after receiving a copy of the FCE completed by Mr. Coleman. Hartford noted that on June 18, 2019, Dr. Francis had indicated on an APS that Plaintiff had the ability to sit, stand, and walk for one hour at a time and for four hours each during a standard workday.  Hartford also referenced Dr. Francis's conclusion in October 2018 that Plaintiff could perform full-time, sedentary work.  Hartford again offered Dr. Francis the opportunity to indicate with a checkmark whether he agreed with certain statements.  This time, Dr. Francis indicated that his prior conclusions did not "remain valid."  AR 1091.  Rather than confirming his own prior opinions, Dr. Francis instead deferred to Mr. Coleman's evaluation, implicitly endorsing the conclusion that Plaintiff could only work for two to three hours per day.

Hartford next sought a records review by Dr. Nourian, who disagreed with Mr. Coleman's conclusions.  Dr. Nourian did not reference Dr. Francis's concurrence with Mr. Coleman's FCE.  In explaining his disagreement with Mr. Coleman, Dr. Nourian stated in part that "most of the study is based on self-reports, and there is no indication to alter work hours."  AR 1075.  Dr. Nourian himself concluded that Plaintiff could work an eight-hour day, 40 hours per week.

Hartford's briefing is critical of Mr. Coleman's evaluation methods, focusing primarily on testing for grip strength.

16

Plaintiff received two failing scores on the grip test, but

Hartford notes that the consistency of effort score was "Poor"

and submits that Mr. Coleman should have administered a third

test for validity.  ECF No. 22-1 at 12 (citing AR 1112, 1119).

Hartford further argues, consistent with Dr. Nourian's

criticism, that testing for sitting, standing, and walking was

based upon self-reports and was not validity-tested.  *Id.*

While validity testing and objective measurements are

desirable, courts do not dismiss subjective self-reporting as

presumptively invalid.  Indeed, the Second Circuit has "long

recognized that subjective complaints of disabling conditions

are not merely evidence of a disability, but are an 'important

factor to be considered in determining disability.'"  *Miles v.*

*Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013)

(quoting *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136

(2d Cir. 2001)).  Here, there is a record of consistent

complaints dating back to a verifiable event (a car accident) in

1999.  Scans have identified damage to Plaintiff's spine, and

Plaintiff has undergone multiple surgeries and years of therapy

to address his injuries.

Hartford's focus on grip testing is curious, as Plaintiff's

disability arises primarily out of this inability to sit, stand,

or walk for extended periods of time.  If Hartford is using the

grip testing to suggest either that Mr. Coleman's methods were

17

flawed, or that Plaintiff is not credible, or both, those attacks are thin at best.  Mr. Coleman's report reflects a thorough examination performed over a period of four to five hours using a variety of assessment tools.  AR 1116-18. Consistency of effort was evaluated through several means.  AR 1119.  As to Plaintiff's credibility, the consistency of reporting over a nearly 20-year period belies any suggestion of malingering.

The denial of benefits was triggered by comments by Dr. Francis that have since been withdrawn.  Giving Dr. Francis's retraction full effect, the longitudinal medical record supports a finding of disability.  Hartford claims improvements after a 2017 surgery, in part based upon the discontinuation of opioids and commencement of other treatments approaches.  The record makes clear, however, that those changes were due primarily to developments in the medical literature and attitudes toward the use of opioids, and not to improvements by this individual patient.  Indeed, as documented by Dr. Francis and others, Plaintiff's condition after 2017 remained largely unchanged.

The standard of review, requiring an abuse of discretion, is significant.  The Court nonetheless finds that this demanding standard has been met.  Plaintiff received LTD benefits under the primary policy for 18 years, and for 13 of those years under the "any occupation" definition of disability.  Since the policy

18

did not change in recent years, a denial of benefits needs to
have been based upon a change in Plaintiff's medical condition.
The record does not evidence such a change.  Over the course of
those 18 years, multiple treating physicians attested to
Plaintiff's complete disability.  While Dr. Francis offered
increasingly liberal assessments and expressed a desire to re-
evaluate after a change in treatment, he ultimately deferred to
Mr. Coleman's conclusion that Plaintiff was unable to work a
full day.  Hartford largely disregarded that deferral.  AR 1055.

　　　Countering the many assessments by treating providers and
Mr. Coleman, most of which are remarkably consistent over a
period of nearly two decades, is the opinion of Dr. Nourian.
The Court acknowledges that plan administrators are not required
"automatically to accord special weight to the opinions of a
claimant's physician."  *Black & Decker Disability Plan v. Nord*,
538 U.S. 822, 834 (2003).  "However, the Court in *Black & Decker*
also observed that ERISA Plan administrators 'may not
arbitrarily refuse to credit a claimant's reliable evidence,
including the opinions of a treating physician.'"  *Paese*, 449
F.3d at 442 (2d Cir. 2006) (quoting *Black & Decker*, 538 U.S. at
834).  Here, the overwhelming medical evidence favors coverage.
This is particularly true when the Court, and any plan
administrator, accepts the retraction by Dr. Francis.  In that
context, Dr. Nourian is the outlier, and basing the denial of

19

coverage largely upon his opinion was unreasonable, arbitrary, and an abuse of discretion.

## Conclusion

For the reasons set forth above, Plaintiff's motion for judgment on the administrative record (ECF No. 19) is granted, and Hartford's motion for judgment (ECF No. 22) is denied.


DATED at Burlington, in the District of Vermont, this 8th day of June, 2022.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge
